STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  DOCKET NO. CV-00-016

ACADIA INSURANCE COMPANY,

      Plaintiff

  v.                                            DECISION AND JUDGMENT

KEISER INDUSTRIES, INC.,

      Defendant


    This matter is before the court on the complaint of the plaintiff Acadia

Insurance Company ("Acadia") seeking a declaratory judgment that there is

no coverage under the policy of commercial insurance ("Policy") issued by it

to the defendant Keiser Industries, Inc., ("Keiser") for losses caused by the

dishonest acts of a Keiser employee. The Policy had an initial one year term

beginning March 9, 1997. It was renewed for additional one year terms

commencing March 9, 1998 and March 9, 1999.

    Keiser claims that there is coverage and has counterclaimed for the

policy limits.

## I. BACKGROUND

    In September 1996 Glenn Searl was hired by Keiser to do operations

work. In mid-December of that year he became Chief Operating Officer. In

early 1997 he was made President and a director of the company and paid

an annual salary of $80,000.[1] In February or March 1997, Searl was provided with a company credit card. Keiser had no written policy regarding its employees taking cash advances or using the company's credit cards for personal charges.

Robert ("Mac") Young was the Chief Financial Officer of Keiser and, as of August 6, 1997, was also its Secretary. Young was responsible for issuing checks, paying bills and keeping records of financial transactions. Bruce Winstanley was an assistant controller at Keiser. Young and Winstanley first became aware of Searl's personal use of the company credit card in March 1997 and maintained an accurate account of his personal purchases and cash advances.

In March 1998 an annual audit for fiscal year 1997 ("FY '97") was conducted by Bradley ("Scott") Belanger, Keiser's outside auditor.[2] Belanger discovered that Searl had made personal charges on the company credit card that appeared to total approximately $40,000. The actual amount was later determined to be $71,173.66. Belanger reported this discovery to Keiser's Board of Directors in March 1998.

Bruce Saunders, Chairman of Keiser's Board, questioned Searl about the charges. Searl was contrite and acknowledged that what he had done was wrong. He promised to repay the charges within two weeks. Searl said he had a condominium and an expensive automobile that could be liquidated

---

[1] In 1998 his salary was increased to $135,000.

[2] The company's fiscal year was the calendar year.

2

and applied to the debt. Saunders admonished Searl not to use the company credit card for personal purposes again without the Board's prior approval. Searl acknowledged the admonition, apologized for his actions and assured Saunders that he would follow his directive.

The Board accepted Searl's explanation and treated his conduct as an error in judgment based in part on a determination that Searl was a trustworthy employee and was under a lot of pressure dealing with company issues. In 1998, the Board did not reduce or dock Searl's pay and did not report the matter to Acadia.

Belanger conducted the company's annual audit for fiscal year 1998 ("FY '98") in early March 1999. Over the course of that fiscal year, Keiser had experienced serious cash problems that greatly concerned its Board. As a result of the audit, Belanger discovered that Searl had continued to use the company credit card to make additional personal charges and cash advances totalling more than $195,649.55. Belanger informed the Board of this discovery and the Board immediately suspended Searl's employment. Young did not provide Belanger with copies of the company's ledger tracking Searl's credit card activity between the FY '97 and FY '98 audits and did not tell Belanger that Searl's debt had been increasing during that period.

In March 1999 Searl promised to repay the money within a few weeks. In April 1999 the Board took Searl's credit card away. On May 27, 1999, the Board terminated his employment because he failed to make the promised repayments.

In April 1999 John Bowman was hired as a consultant and CEO of

Keiser. On June 14, 1999, he filed a claim and a sworn proof of loss with Acadia alleging that Searl had engaged in a pattern of dishonest conduct and unauthorized borrowing which was discovered by Keiser in the spring of 1998. Keiser also submitted a spreadsheet detailing its claim for losses in FY '97 and FY '98.

Acadia contends that there is no coverage because the Policy was canceled upon discovery of Searl's conduct in 1998 and because Acadia was prejudiced by Keiser's failure to timely report the loss as required by the Policy.

## II. DISCUSSION

A. Coverage and Cancellation

It is not seriously challenged that Searl engaged in dishonest acts in both FY '97 and FY '98 or that Keiser suffered significant losses as a result of that dishonesty. The question is whether the Policy covers Keiser for these losses.

Interpretation of an insurance policy is a question of law. *Jack v. Tracy*, 1999 ME 13, ¶ 8, 722 A.2d 869, 871. Standard insurance policies are to be construed against the insurer, with the unambiguous language interpreted according to its plain and commonly accepted meaning. *Id.* An insurance policy is ambiguous if it is reasonably susceptible to different interpretations. *Apgar v. Commercial Union Ins. Co.*, 683 A.2d 497, 498 (Me. 1996). In determining whether the Policy is ambiguous, this Court must evaluate the instrument as a whole to see "how far one clause is explained, modified, limited or controlled by the others." *Id.*

4

In relevant part, the Policy provides that

This insurance is canceled as to any "employee":

a   Immediately upon discovery by

(1) You; or

(2) Any of your partners, officers or directors not in collusion with the "employee", of any dishonest act committed by that "employee" whether before or after becoming employed by you.

According to the Policy, "employee dishonesty" means

[D]ishonest acts committed by an "employee", whether identified or not, acting along or in collusion with other persons, except you or a partner, with the manifest intent to:

(1)   Cause you to sustain loss; and also

(2)   ·Obtain financial benefit ... for:

(a)   The "employee"; or

(b)   Any person or organization intended by the "employee" to receive that benefit.

By its terms, the Policy covers acts of dishonesty by an employee that cause the loss of "money," "securities," and "property other than money and securities" and becomes canceled as to that employee immediately upon discovery of the dishonest acts by an officer or director who is not in collusion with the dishonest employee. In the context of this case, the issues of coverage and cancellation turn on when Keiser discovered, or should have discovered, that Searl engaged in dishonest acts that caused the claimed loss.

Keiser's proof of loss executed in 1999 reflects that its Board became aware of Searl's FY '97 conduct in the spring of 1998. By March 1998 the

5

Board knew that Searl had made personal charges of at least $40,000 on the company card -- the equivalent of nearly one-half of his gross annual salary for 1997. That sum was later determined to be over $71,000 -- equivalent to almost 90% of his 1997 annual salary. Although the Board did not have a policy concerning an employee's personal use of a company credit card, it knew that Searl did not have authority or permission to use it in that fashion. It knew that the amount in question was excessively large, particularly in view of Searl's salary level. It also knew that Searl had acknowledged to Board Chairman Saunders that his conduct was wrong. Finally, it knew within two weeks of Saunders' initial discussion with Searls in March 1998 that Searls failed to keep his promise to repay the money.

In March 1998, the Board considered Searl's conduct to be an error in judgment, not a dishonest act. However, this determination was not objectively reasonable under the circumstances. The Board had a significant collection of knowledge and facts regarding Searls' acts of dishonesty. Neither his words of contrition, nor his convenient and unkept promise of repayment could transform that dishonesty to a mere error in judgment. To compound matters, the Board allowed Searl to keep the credit card when it should have taken it from him. Failing that, it took no action to monitor his use of the card even after his promised repayment failed to materialize. Having in mind the totality of the circumstances known to the Board in March 1998, it should have considered Searl's conduct to be dishonest at that time.

The Policy also provides for cancellation when the dishonest conduct

6

is discovered by any officer of the company who is not in collusion with the dishonest employee. The term "officer" is not defined in the Policy. The Maine Business Corporation Act ("MBCA") identifies the officers of a corporation as the president, treasurer, and, if the bylaws provide, one or more vice presidents. 13-A M.R.S.A. § 714(1) (1981 & Supp. 2000). The MBCA also allows the Board to elect or appoint any other officers or assistant officers as are deemed necessary. *Id.* § 714(5).

As of August 6, 1997, Young was the Secretary of Keiser. However, his duties were purely ministerial and only required him to perform the clerk's function of certifying resolutions when the clerk was unavailable. A clerk is not an officer under Maine law. *See id.* § 714(1) & 11(E). The court concludes that Young was not an officer within the meaning of the Policy which is material to a consideration of the "collusion" provision of the Policy.

In sum, the court finds that in March 1998 the Board discovered, or should have discovered, that Searl engaged in dishonest acts against Keiser that caused the claimed loss. Thus, by its terms, the Policy was canceled as to Searl from and after that discovery.

B. Prejudice

The Policy imposed a notice of loss requirement on Keiser as a condition precedent to coverage:

> Duties in the Event of Loss: After you discover a loss or situation that may result in loss of, or loss from damage to, Covered Property you must:
>
> a. Notify us as soon as possible.

b.  Submit to examination under oath at or request and give us a signed statement of your answers.

c.  Give us a detailed, sworn proof of loss within 120 days.

d.  Cooperate with us in the investigation and settlement of any claim.

For an insurer to avoid "either its duty to defend or its liability [under a policy] based on an insured's delay in giving notice, a liability insurer must show (a) that the notice provision was in fact breached, and (b) that the insurer was prejudiced by the insured's delay." *Ouellette v. Maine Bonding & Cas. Co.*, 495 A.2d 1232, 1235 (Me. 1985). Keiser gave the notice of loss to Acadia on June 14, 1999. Based on the determination that Keiser should have been aware by March 1998 that Searl's conduct was dishonest, the court concludes that Keiser breached the Policy's requirement that notice be given "as soon as possible". This leads to consideration of the issue of whether Acadia was prejudiced by any resulting delay in notification. The insurer bears the burden of proof to demonstrate prejudice. *Id.*

The court finds that Acadia has sustained its burden and has shown that it was prejudiced in several respects by the lack of a timely notice. Acadia lost the opportunity to attempt to recover some or all of the amount of the FY '97 losses by levying upon the condominium and the expensive automobile which Searl professed to own at the time. Keiser's forbearance enabled Searl to continue his dishonest conduct for more than one year after its initial discovery by which time his assets were dissipated. The delay also deprived Acadia of the opportunity to conduct a timely investigation of the matter.

8

## III. DECISION

Based upon the foregoing, and pursuant to Rule 79(a) M.R. Civ. P., the Clerk is directed to enter this Decision and Order on the Civil Docket by a notation incorporating it by reference, as follows:

1. As to the plaintiff's complaint, it is adjudged and declared that the Policy issued by Plaintiff to Defendant does not cover the claimed losses caused by the acts of Defendant's employee, Glenn Searl.

2. As to the defendant's counterclaim, Judgment is entered for Plaintiff.

Dated: July 20, 2001

_____

Justice, Superior Court

Date Filed __01-07-00__  __CUMBERLAND__  Docket No. __CV 00-016__

County

Action __DECLARATORY JUDGEMENT__

ACADIA INSURANCE COMPANY                    KEISER INDUSTRIES, INC.

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| THOMAS S. MARJERISON ESQ 774-7000 | WILLIAM W. WILLARD ESQ    774-1200 |
| PO BOX 4600, PORTLAND ME 04112 | PO BOX 9729, PM   04104 |

| Date of Entry | |
|---|---|
| 2000 Jan. 10 | Received 01-07-00: Complaint Summary Sheet filed. |
| "    " | Complaint for Declaratory Judgment with Exhibits A,B,C, and D filed. |
| "    " | Unserved Summons on Keiser Industries, Inc. filed. |
| Jan. 24 | Received 01.20.00: Notice and Acknowledgment of service filed showing receipt of service on 1. upon defendant Keiser Industries, to William W. Willard, Esq. |
| Feb. 7 | Received 2-4-00. Defendant's notification of discovery service filed. Defendant's request for production of documents propounded upon plaintiff served on Thomas Marjerison, Esq. on 2-3-00. |
| "" | Counterclaim Summary Sheet filed. |
| "" | Defendant's Answer and Counterclaim filed. |
| Feb. 09 | Received 02-09-00: Plaintiff's Answer to Defendant's Counterclaim filed. |
| Feb. 10 | Received 02-10-00: Scheduling Order filed. (Delahanty, J.). Scheduling Order filed. Discovery deadline is October 10, 2000. On 02-10-00 Copies mailed to Thomas S. Marjerison, Esq. and William Willar Esq. |
| Feb. 14 | Received 2-11-00. Plaintiff's Notification of Discovery Service filed. Plaintiff's objections to defendant's request for production of documents served on William W. Willard, Esq. on 2-10-00. |
| Feb. 24: | Received 2-24-00. Plaintiff's Notification of Discovery Service, filed. Plaintiff's Response to Defendant's Request for Production of Documents served on William Willard, Esq. on 2-18-00. |